## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| Rasputin Stash LLC, Paul N. Coleman, Estate of Martin Dumas, Ernest Frank Donaldson, and Bruce Butler, <br><br> Plaintiffs, <br><br> v. <br><br> Bek David Campbell, Universal Music Group, Inc., Warner Music Group, Corp., Mike Simpson, John King, Interscope Records, Inc., Interscope Geffen A&M Records, Joseph Guillmeron Jones, and Cory Woods, <br><br> Defendants. | Case No.: 1:25-cv-04896 <br><br> Hon. Jeremy C. Daniel |

## FIRST AMENDED COMPLAINT

Plaintiffs Rasputin Stash LLC, Paul N. Coleman, Estate of Martin Dumas, Ernest Frank Donaldson, and Bruce Butler, pursuant to Rule 15 of the Federal Rules of Civil Procedure and by and through their undersigned attorneys, state as follows:

### Nature of This Action

1.     Plaintiffs Rasputin Stash LLC, Paul N Coleman, Estate of Martin Dumas, Ernest Frank Donaldson, and Bruce Butler (each a "Plaintiff" and collectively "Plaintiffs") seek monetary from and injunctive relief against Defendants Bek David Campbell, Universal Music Group, Inc., Warner Music Group Corp., Mike Simpson, John King, Interscope Records, Inc., Interscope Geffen A&M Records, Joseph Guillmeron Jones, and Cory Woods (each a "Defendant" and collectively "Defendants") for copyright infringement of two musical compositions pursuant to the Copyright Act (17 U.S.C. § 101 *et al.*) and two pre-1972 sound recordings pursuant to the common law of the State of New York.

## Parties

2.      Plaintiff Rasputin Stash LLC ("Rasputin Stash") is a limited liability company organized under the laws of the State of Illinois, formed to administer the copyright rights for the musical group Rasputin Stash. Rasputin Stash was an eight-member recording group active in the 1970s, founded by Martin Dumas, composed of: Paul N. Coleman, Ernest Frank Donaldson, Bruce Butler, Vince Willis, Martin Dumas (deceased), Wardell Peele (deceased), Norval Taylor (deceased), and James Whitfield (deceased).

3.      Plaintiff Paul N. Coleman ("Coleman") is an individual residing in Illinois and was a member of the band Rasputin Stash.

4.      Plaintiff Estate of Martin Dumas ("Dumas Estate") is the estate of Martin Dumas, the deceased founder of the band Rasputin Stash.

5.      Plaintiff Ernest Frank Donaldson ("Donaldson") is an individual residing in Illinois and was a member of the band Rasputin Stash.

6.      Plaintiff Bruce Butler ("Butler") is an individual residing in Illinois and was a member of the band Rasputin Stash.

7.      Defendant Bek David Campbell ("Beck") is a singer, songwriter, record producer, and musician residing, upon information and belief, in Los Angeles, California. Beck is famous for his experimental lo-fi style and his ability to create musical collages that span many genres.

8.      Defendant Universal Music Group, Inc. ("UMG") is a corporation organized under the laws of the State of Delaware with an address at 2220 Colorado Avenue, Santa Monica, California 90404.

9.      Defendant Warner Music Group Corp. ("WMG") is a corporation organized under the laws of the State of Delaware with an address at 1633 Broadway, New York, New York 10019.

10.      Defendant Michael Simpson p/k/a Z Mike ("Simpson") is a songwriter and producer residing, upon information and belief, in Los Angeles, California. Simpson is a member of The Dust Brothers duo, which is famous for its sample-based music.

11.      Defendant John King p/k/a King Gizmo ("King") is a songwriter and producer residing, upon information and belief, in Los Angeles, California. King is a member of The Dust Brothers duo, which is famous for its sample-based music.

12.      Defendant Interscope Records, Inc. ("Interscope") is a corporation organized under the laws of the State of Delaware with an address at 10900 Wilshire Blvd., Suite 1400, Los Angeles, California 90024.

13.      Upon information and belief, Defendant Interscope Geffen A&M Records ("Geffen") is a division of Defendant UMG.

14.      Defendant Joseph Guillermon Jones p/k/a Jim Jones ("Jones") is an individual residing in the State of New York. Jones is a rapper, producer, writer, and a founding member of the hip-hop collective The Diplomats.

15.      Defendant Cory Woods p/k/a Raekwon ("Woods") is an individual residing in the State of New York. Woods is a rapper, entertainer, and a founding member of Wu-Tang Clan.

### Jurisdiction and Venue

16.      This action arises, in part, under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act").

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

18.     This Court has supplemental jurisdiction to hear Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1400 in that a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this judicial district and all Plaintiffs are residents of Illinois.

20.     This Court has personal jurisdiction over each of the Defendants because, upon information and belief, each Defendant derives substantial revenue from activities directed at this judicial district, conducts systemic and continuous business within this judicial district, and has taken actions causing harm to Plaintiffs, residents of Illinois, including infringing upon Plaintiffs' federal copyright rights and common law copyright rights, which are the basis of this action.

## Statement of Facts

21.     On June 1, 1971, Plaintiff members of Rasputin Stash, ("Rasputin" herein) an eight-man group of musicians from Chicago, entered into a production agreement with Inter-Pan Inc. ("Inter-Pan") to record music (the "Inter-Pan Agreement").  *See* Exhibit 1. Under the Inter-Pan Agreement, Plaintiff members of Rasputin recorded exclusively with Inter-Pan in exchange for royalties earned from the sale of the resulting sound recordings.

22.     In a related agreement also made on June 1, 1971, Inter-Pan entered a production agreement with Atlantic Recording Corporation ("Atlantic"), a label under now owned by Defendant WMG, to provide sound recordings created and produced by Rasputin under the Inter-

4

Pan Agreement, for distribution (the "Atlantic Agreement"). Inter-Pan received an advance of $12,500, repayable from royalties earned by Rasputin. *See* Exhibit 2.

23.    Under the Inter-Pan Agreement, Plaintiff members of Rasputin assigned their rights in the sound recordings, produced as part of the Inter-Pan Agreemen, to Inter-Pan on the condition that Inter-Pan pay Plaintiff members of Rasputin a percentage of the profits generated by Inter-Pan's exploitation of the same.

24.    The Atlantic Agreement expressly references and is dependent upon the Inter-Pan Agreement (together, the "Agreements").

25.    In the Atlantic Agreement, Inter-Pan assigned its rights in the sound recordings produced as part of the Inter-Pan Agreement to Atlantic on the condition that Atlantic pay certain percentages of the profit Atlantic earned by exploiting the sound recordings in different ways.

26.    Paragraph 3(d) of the Atlantic Agreement states that Atlantic "agrees to pay to [Inter-Pan] the following royalties: . . . (d) A sum equal to one-half (1/2) of the net profits actually received by [Atlantic] for any other uses of said Masters not specifically provided for herein."

27.    Paragraph 14 of the Atlantic Agreement states that "[t]his agreement shall be construed pursuant to and governed by the laws of the State of New York applicable to agreements to be wholly performed therein . . . ."

28.    The sound recordings produced pursuant to the Agreements were protected by common law copyright under the laws of the State of New York.

29.    The musical compositions produced pursuant to the Agreements were protected by the Copyright Act and all such copyright rights were retained by Plaintiffs.

30.     On September 1, 1971, Atlantic released the "Rasputin Stash" album featuring recordings of songs written and recorded by Plaintiffs pursuant to the Agreements. ("Album" herein). The Album was not promoted and was not a commercial success, at that time.

31.     Two original songs, Dookey Shoe and Mr. Cool, were written and recorded pursuant to the Agreements and appeared on the Album.

32.     Plaintiff Coleman wrote the musical composition for Dookey Shoe, which is protected by federal Copyright Registration No. EU 269,208.

33.     Plaintiff Dumas wrote the musical composition for Mr. Cool, which is protected by federal Copyright Registration No. EU 269,206 ."   Dookey Shoe and Mr. Cool are referred to together herein as the "Works

34.     Years later, Rasputin disbanded and Inter-Pan dissolved.

35.     In 2023, Plaintiff members of Rasputin discovered that the Album was being offered for sale on the Internet and that the Works had been sampled by several musical artists.

36.     Upon information and belief, Defendants WMG, UMG, Interscope, and Geffen (the "Entity Defendants") licensed samples of the Works to various recording artists, including Defendants Beck, Simpson, King, Jones, and Woods ("Artist Defendants").

37.     Pursuant to the Atlantic Agreement, one half of any net profits generated by Entity Defendants through licensing samples of the Works should have been paid to Inter-Pan, which would have paid Plaintiffs.

38.     Upon information and belief, Entity Defendants generated profit by licensing samples of the Works.

39.     Entity Defendants did not pay any of the profits generated by licensing samples of the Works to Inter-Pan or any Plaintiff.

40.     Any Artist Defendant that incorporated a sample from the Works in a new sound recording would, in addition to a license from the owner of the sound recording, require a license from the owner of the relevant musical composition.

41.     No Artist Defendant obtained a license from Plaintiffs, which own the copyright rights for the relevant musical compositions.

42.     Upon information and belief, Artist Defendants generated profit by sampling the Works.

### Claims for Relief

### COUNT I – COPYRIGHT INFRINGEMENT
### *As to Artist Defendants*

43.     Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 42.

44.     Plaintiff Coleman is the owner of Copyright Registration No. EU269,208 for the musical composition for the song Dookey Shoe.

45.     Plaintiff Dumas is the owner of Copyright Registration No. EU269,206 for the musical composition for the song Mr. Cool.

46.     Defendant Beck released his album Odelay in 1996, containing the songs High 5 (Rock the Catskills) and Hotwax.

47.     High 5 (Rock the Catskills) incorporates a sample of the sound recording of Mr. Cool.

48.     Hotwax incorporates a sample of the sound recording of Dookey Shoe.

49.     Defendant Beck used Mr. Cool and Dookey Shoe as samples without authorization from Plaintiffs Dumas and/or /Coleman.

50.     Defendant Beck's use of Mr. Cool and Dookey Shoe as samples without authorization constitutes copyright infringement.

51.     Defendants Simpson and King collaborated on the release of the album Odelay in 1996, containing the songs High 5 (Rock the Catskills) and Hotwax.

52.     High 5 (Rock the Catskills) incorporates a sample of the sound recording of Mr. Cool.

53.     Hotwax incorporates a sample of the sound recording of Dookey Shoe.

54.     Defendants Simpson and King used Mr. Cool and Dookey Shoe as samples without authorization from Plaintiffs Dumas and/or /Coleman.

55.     Defendants Simpson's and King's use of Mr. Cool and Dookey Shoe as samples without authorization constitutes copyright infringement.

56.     Defendant Jones released his song We Fly High, in 2006.

57.     We Fly High incorporates a sample of the sound recording of Mr. Cool.

58.     Defendant Jones used Mr. Cool as a sample without authorization from Plaintiff Dumas.

59.     Defendant Jones's use of Mr. Cool as a sample without authorization constitutes copyright infringement.

60.     Defendant Woods released Stick Up Music in 2009.

61.     Stick up Music incorporates a sample of the sound recording of Mr. Cool.

62.     Defendant Woods used Mr. Cool as a sample without authorization from Plaintiff Dumas.

63.     Defendant Woods' use of Mr. Cool as a sample without authorization constitutes copyright infringement

64.     As a direct result of Artist Defendants' acts of infringement, Plaintiffs Dumas and Coleman are entitled to injunctive relief, damages, and disgorgement of profits.

65.     The Artist Defendants' infringing acts described herein were committed willfully and continue to be committed willfully as they are still being distributed.

### COUNT II – BREACH OF CONTRACT/ACCOUNTING/RESCISSION
### *As to Entity Defendants*

66.     Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 69.

67.     The relevant sound recordings were created by Plaintiffs under the Agreements between Plaintiffs, Inter-Pan, and the Entity Defendants' predecessors.

68.     Such sound recordings were created pursuant to the Agreements and under the laws of the State of New York.

69.     Pursuant to the Agreements, sound recordings were assigned to the Entity Defendants' predecessor on the condition that the Entity Defendants' predecessor pay royalties at rates set for different revenue streams related to the exploitation of the sound recordings.

70.     Pursuant to the Agreements, the Entity Defendants must pay Inter-Pan one half of the net profits derived from any use of those sound recordings not expressly contemplated by the Agreements so that Inter-Pan could pay royalties to Plaintiffs.

71.     Inter-Pan's dissolution does not absolve the Entity Defendants of their obligation to pay out one half of the net profits derived from any use of the sound recordings as described above.

72.     Entity Defendants have, upon information and belief, generated significant profits licensing the sound recordings at issue to various recording artists for use as samples but have not made any payments to Plaintiffs.

73. Plaintiffs are entitled to an accounting of all profits generated by the Entity Defendants through their exploitation of the sound recordings created under the Agreements.

74. Entity Defendants' failure to make any of the required payments described above is cause for rescission of the Agreements.

75. The dissolution of Inter-Pan is cause for rescission of the Agreements.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that the Court enter the following judgment against Defendants:

1. That Defendants, their officers, agents, servants, employees, and any persons in active concert or participation with them be permanently enjoined and restrained from infringing upon Plaintiffs' copyrighted Works in any manner whatsoever, and specifically distributing copies of sound recordings embodying Plaintiffs' federally registered musical compositions;

2. Order the impounding of all sound recordings embodying Plaintiffs' federally registered musical compositions that are within Defendants' possession, custody, or control;

3. Award Plaintiffs their actual damages as well as Defendants' profits attributed to Defendants' infringing acts;

4. Award Plaintiffs their costs and attorneys' fees incurred in this action;

5. Award Plaintiffs pre-judgment interest on their judgment;

6. Order a full accounting from the Entity Defendants of all profits generated by their exploitation of the relevant sound recordings; and

7. Such other and further relief as the Court may deem equitable, proper and just.

Dated:     March 13, 2026                                    Respectfully submitted,
           Chicago, Illinois                                 SEAN M. MULRONEY & ASSOCIATES

By:

Sean M. Mulroney
516 N. Ogden Avenue
Suite 191
Chicago, Illinois 60607
(t) 312.756.0011
(e) sean@seanmulroney.com

Anderson J. Duff
DUFF LAW PLLC
353 Ocean Avenue 4E
Brooklyn, New York 11226
(t) 646.450.3607
(e) ajd@hoganduff.com

# EXHIBIT

# 1

Dated: *June 1, 1971*

Inter-Pan Inc.
John Hancock Center (Suite 5125)
Chicago, Illinois 60611

Dear Sir:

This letter will set forth and constitute a binding agreement between you (hereinafter referred to as "Seller") and ourselves (hereinafter referred to as "Purchaser").

1.    (a)  Seller represents and warrants that it is the sole and exclusive owner of the entire right, title and interest including all copyrights and all property rights in and to the master recordings subject and becoming subject to this agreement          and in and to the performances embodied thereon for the entire world (hereinafter referred to as the "Masters").

(b)  Seller further represents and warrants that the Masters and the performances embodied thereon were produced in all respects in accordance with the rules and regulations of the American Federation of Musicians and all other Unions having jurisdiction; that the Masters and the performances embodied thereon do not come within the terms of paragraph 17 of the American Federation of Musicians Phonograph Record Labor Agreement (April, 1969)* or that the requirements of said paragraph have been satisfied; that such representation and warranty is included for the benefit of the American Federation of Musicians (among others) and may be enforced by it or by such person or persons as it may designate; that it has the entire right and authority to enter into and to perform this agreement and all parts thereof; that is has not granted, nor has it done or permitted others to do, nor will it do or permit others to do any acts or things which would be in derogation of the absolute title or any of the rights herein granted to Purchaser, nor has it made nor will it make any grant of rights or permit the making of any grant of rights incorporated with the title and rights herein granted to any one other than Purchaser; that there are no claims or threats of claims or litigations involving the Masters or said performances; that all costs incurred in the creation and production of such Master have been paid and that neither the Master nor the performances embodied thereon nor any use thereof by Purchaser or its grantees will violate or infringe upon the rights of any third parties. Seller agrees to and hereby does hold Purchaser harmless against any and all liability, loss, damage, cost or expense, including

* or the equivalent provisions of any successor agreement

- 2 -

legal fees, paid by or incurred by reason of any breach or
failure or claim of breach or failure of any of Seller's
covenants, warranties or representations hereunder. Pending
the determination of any such claim, failure or breach,
Purchaser is granted the right to withhold payment of royalties
hereunder.

2. Seller hereby sells, assigns and tranfers to
Purchaser, its successors or assigns, absolutely and forever
and without any limitations or restrictions whatever, not
specifically set forth herein, the entire right, title and
interest in and to each of the Masters and in and to each of
the performances embodied thereon. Promptly following the
execution of this agreement Seller shall deliver to Purchaser
all tape recordings, acetates and metal or other parts or re-
productions of said Masters presently in existence and shall
immediately cease and discontinue the manufacture, distribution
and sale of all reproductions of said Masters. Seller further
assigns to Purchaser absolutely and forever all rights and
privileges of Seller to use the names, biographies and like-
nesses of all artists whose performances are embodied on said
Masters,* and all other rights, privileges and interests now
known or herafter to come into existence, now or hereafter
owned or controlled by Seller, which pertain to, have any
commercial effect upon or are derived from said Masters and
the performances embodied thereon.

3. In full consideration for the sale to it of said
Masters and of the performances embodied thereon, Purchaser
agrees to pay to Seller the following royalties:

(a) A sum equal to eight and one-half (8½) percent of the
retail list price for ninety (90) percent of all records
manufactured from said Masters and sold and paid for within
the Continental United States and not subject to return;

(b) A sum equal to one-half (½) of the above
sum for ninety (90%) percent of all records manufactured from
said Masters and sold outside of the Continental United States.
Said sum shall be payable only thirty (30) days after Purchaser
has received such sums in the United States in United States
currency;

(c) A sum equal to one-half (½) the applicable
sum set forth in subparagraph (a) or (b) above for records
sold in the form of pre-recorded tape or sold by way of mail
order or "club" plans as distinguished from regular retail
store sales. No monies shall be payable on "bonus" or "free"
records distributed by "clubs";

*as well as their professional name "RASPUTIN'S STASH"



- 3 -

(d)   A sum equal to one-half (½) of the net profits actually received by Purchaser for any other uses of said Masters not specifically provided for herein.

(e)   In the event Masters hereunder are coupled or released together with masters not subject to the terms hereof on one recording, Seller will receive that proportion of the sums payable to it hereinabove as the number of Masters hereunder embodied on such recording bears to the total number of masters embodied thereon;

(f)   Retail list price is hereby defined as being the suggested retail selling price in the country of manufacture or sale, at Purchaser's option, less taxes, duties and Purchaser's standard deductions in respect of packaging. Monies shall not be payable to Seller for any records given away or sold at less than Purchaser's actual costs therefor, for "cutouts", or for records sold or distributed at less than Purchaser's normal wholesale list price in order to effectuate a discount from such wholesale list price;

(g)   The sums above payable include all monies payable to recording artists whose performances are embodied on said master and the producers thereof; and Seller agrees to pay and to be solely liable for payment of all monies payable or becoming payable to said recording artists and producers.

4.   Payments of all sums to Seller, except those set forth in Paragraph 3 (b) hereof, shall be made quarterly within sixty (60) days following the calendar quarters ending March 31, June 30, September 30 and December 31 and shall be accompanied by a statement setting forth the computation of such sums. Unless Seller objects, in writing, to any such statement or payment within ninety (90) dyas after receipt thereof, said statement or payment shall be deemed finally binding upon and accepted by Seller.



- 4 -

5.    Seller agrees that for a period of five (5) years from the date of Purchaser's purchase of each master recording subject and becoming subject to this agreement, Seller will not record or produce nor will Seller permit others to record or produce phonograph records embodying the performance by any artisit whose performance is embodied in any master recording subject and becoming subject to this agreement, of the composition embodied in such master recording, for anyone other than Purchaser.

6.    For the purposes hereof, "phonograph record", "record" and "master" are defined as meaning any device of any kind of nature whether now or hereafter known, for the reproduction of sound, whether or not the sound is synchronized with visual images including, but not limited to, all types of electronic video recordings.

7.    Seller warrants and represent that Martin Luther Dumas, Jr., Bruce Butler, Vince Willis, Paul Neal Coleman, Ernest Frank Donaldson, Norval Taylor, Wardell Peel and James Whitfield, (hereinafter jointly and severally called "Artist") is under exclusive contract to Seller as a recording artist for a period no less extensive that the term of this agreement set forth in Paragraph 10 hereof in such manner that Purchaser shall have the right to acquire all recordings made during the term of this agreement by any one or more of the aforesaid individuals, whether as an individual or as a member of the group known as "RASPUTIN'S STASH" or any other group, regardless of the name or names under which they may identify themselves. Seller agrees to cause Artist to execute the guaranty annexed hereto as Exhibit "1" by which Artist shall agree to fully render their services so that Purchaser shall have all of the benefits provided for in this agreement. For so long as Purchaser shall have any rights pursuant to this agreement, Seller shall not waive or forfeit its exclusive rights to the services of said Artist.

8.    Upon the execution and delivery to purchase of this agreement and the Exhibit annexed hereto, Purchaser shall pay to Seller the sum of $12,500., which payment shall constitute an advance against and shall be recouped from all royalties becoming payable to Seller by reason of this agreement.

9.    Seller hereby grants to Purchaser the exclusive right and option during the term of this agreement to purchase upon the terms and conditions hereof each and every master recording now or hereafter owned or controlled by Seller directly or indirectly, or produced with Seller's authority, which embodies the performances of Artist but in no event less than two (2) 33 1/3 rpm long-playing phonograph record albums per year or the equivalent number of single master recordings. In this connection, Seller agrees that, upon



Purchaser's request, Seller shall propose in writing to Purchaser a specific recording project, including the musicians and producer (s) whose services will be used, the musical compositions to be recorded and the estimated costs with respect to the recording session or sessions. Each project shall be subject to written approval by Purchaser in advance. Upon receipt of approval, Seller shall produce such recording sessions as have been approved, and Purchaser's representatives may attend such sessions. Purchaser agrees to pay the actual invoices for such sessions up to the amount of the approved budget, which payments shall constitute advances against and shall be recouped from all royalties becoming payable to Seller by reason of this agreement. Seller agrees to make the finished tape or tapes available to Purchaser immediately upon completion, subject to this agreement.

10. The term of this agreement shall be for a period of one (1) year from the date hereof. Purchaser shall have the irrevocable right and option to extend the term of this agreement for four (4) additional consecutive separate and severable periods of one (1) year each. Purchaser shall exercise its options by giving Seller written notice of such exercise, at least twenty (20) days prior to the date on which this agreement would otherwise expire.

11. Subject to the availability of sufficient number of completed masters sufficiently in advance of the first contract year hereunder, Purchaser agrees to release at least two (2) 33 1/3 rpm long-playing albums or the equivalent number of 45 rpm "singles" during such year.

12. Seller agrees to indemnify Purchaser and hold Purchaser harmless from and against all liability, loss, damage, cost or expense, including reasonable legal fees, paid or incurred by Purchaser by reason of any breach or failure of Seller's or Artist's representations or warranties hereunder. Pending the determination of any claim involving such breach or failure, Purchaser may withhold payment of royalties hereunder in an amount reasonably related to the value of the claim. Seller shall have the right to participate in the defense of any such claims at its own expense.

13. In the event that Artist shall write or compose any musical composition which is recorded by Artist hereunder, or in the event that Seller shall own or control directly or indirectly, any such musical composition, Seller agrees to assign or cause to be assigned to Purchaser or its designee an undivided fifty (50%) percent interest in and to each such composition and all copyrights therein, together with the exclusive right to administer each such composition throughout the entire world. In this connection, the



- 6 -

parties agree to execute or cause to be executed all documents necessary to effectuate the interest hereof.

14.   This agreement shall be binding upon both Seller and Purchaser and their respective successors and assigns, and shall be deemed effective upon the date of this letter.  This agreement shall be construed pursuant to and governed by the laws of the State of New York applicable to agreements to be wholly performed therein, and is the entire agreement between parties and cannot be modified except in a writing signed by both parties hereto.  Invalidity or unenforceability of any part of this agreement shall not affect the validity and enforceability of the balance thereof.

15.  See Rider attached and made a part hereof.

Very truly yours,

ATLANTIC RECORDING CORPORATION

By _Sheldon Vogel_

AGREED TO:

INTER-PAN INC.

By _Rossman_
P. J. Rossman, Pres.

Employer Identification No.

~~applied for~~



R I D E R

Notwithstanding anything contained in the agreement to the contrary, the following provisions shall apply:

1. Upon reasonable notice Seller shall have the right to audit the books and records of Purchaser not more than once each year as such records pertain to the subject matter of this agreement.

2. All rules and regulations of the American Federation of Musicians are incorporated in this agreement.

3. With respect to paragraphs 3 and 10, each option year the royalty rate 3(a) shall be increased 1/2% up to a ceiling of ten per cent (10%).

4. With respect to paragraph 13, all compositions under the control of Seller and assigned to designee of Purchaser and recorded by Artist shall be licensed at no less than the statutory rate if such compositions are released by Purchaser or one of its controlled companies.

5. Purchaser may elect at any time hereunder to provide its own producer for Artist sessions upon reasonable notice to Seller. Costs for same shall be paid exclusively by Purchaser.

ATLANTIC RECORDING CORPORATION

By _____*Sheldon Vogel*_____

INTER-PAN INC.

By _____*Rosman*_____
*P. J. Rossman, Pres.*



# EXHIBIT

# 2

June 1, 1971

Atlantic Recording Corporation
1841 Broadway
New York, New York   10023

Gentlemen:

Reference is made to a certain agreement dated June 1, 1971
between you and INTER-PAN INC.                    (hereinafter
called "PRODUCTIONS") relating to my exclusive services as a record-
ing artist ("said agreement").

In order to induce you to enter into said agreement and to pay
a good valuable consideration therefor, I hereby agree as follows:

1.  I hereby specifically guarantee the performance by
PRODUCTIONS of all of the warranties and representations and cove-
nants made in said agreement.  I hereby make all of the warranties
and representations made to you in said agreement, grant you all
of the rights and remedies therein granted to you and agree to per-
form all of the obligations therein undertaken to be performed for
you and undertake to be bound thereby as though I was a party to
said agreement.  I agree that you shall have the right in addition
to any other remedies available to you at law or in equity or by
reason of this agreement or said agreement to specifically enforce
said agreement against me.  No notice need be given to me of any
modification or waiver of the provisions of said agreement for the
purposes of your enforcing said agreement or this agreement against
me.

2.  Without limiting any of the rights granted to you in the
said agreement, I hereby grant you the right to use and publish and
to permit others to use and publish my name, *likeness and all biograph-
ical material concerning me and to permit others to write and publish
articles concerning me for advertising or trade purposes in connection
with the sale and exploitation of my records.

3.  I agree that I will look solely to PRODUCTIONS for the
payment of all monies payable to me by reason of my rendering my
services in accordance with said agreement, and I agree that you
shall have no responsibility to me therefor whatsoever.  No breach
by PRODUCTIONS of any agreement or agreements which I may now or
from time to time have with PRODUCTIONS shall be sufficient cause

* (and the name "RASPUTIN'S STASH")



-2-

for my failure or refusal to fully perform for you in accordance
with the said agreement and this agreement. Should any dispute
arise between me and PRODUCTIONS, you shall, upon notice by me,
sent to you by registered mail, withhold the payment of all sums
due and becoming due to PRODUCTIONS pursuant to said agreement pend-
ing a determination of such dispute. No failure on your part to
make any payment to PRODUCTIONS by reason of such withholding shall
be deemed to be a breach of said agreement. Should PRODUCTIONS
fail or refuse to produce recordings by me for you pursuant to said
agreement, you shall have the right to designate the producers of
such recording who shall render their services at the expense of
PRODUCTIONS, and I shall render my services with such producers
directly for you.

4. I agree to fully render any performances for you and
PRODUCTIONS in accordance with said agreement for so long as said
agreement shall be in effect. I further agree that for so long as
said agreement shall be in effect I will exclusively render my per-
formances for you in connection with the production of phonograph
records and I will not perform in any capacity whatsoever (indivi-
dually or as part of a group or otherwise) for any other person,
firm or corporation for the purpose of making phonograph records.

5. In the event of the breach of any term hereof or of said
agreement by me, I agree that you shall be entitled to injunctive
relief in addition to any other rights or remedies available to
you. It is agreed that my services for the purpose of recording
phonograph records pursuant to said agreement and this agreement are
of a special, unique and extraordinary character.

6. I warrant and represent that I have the right to enter into
this agreement, and that I and PRODUCTIONS have the right to grant
you all of the rights granted in said agreement and in this agreement,
and that neither this agreement nor said agreement nor any perfor-
mance of ours thereunder shall be in violation of the rights of any
third party.

7. I agree to indemnify you and hold you harmless from and
against any liability, loss, damage, cost or expense including
reasonable legal fees paid or incurred by you by reason of any breach
by me or PRODUCTIONS or failure of the covenants, representations or
warranties contained herein or in said agreement.



-3-

8. You shall have the right to secure insurance with respect to me for your own benefit. In this connection, I agree to make myself available for physical examinations by a physician as and when reasonable requested to do so and to complete such question-naires and other documents which you or any insurance carrier may from time to time require in connection with securing and main-taining such insurance.

If the foregoing is in accordance with your understanding, please sign below.

Very truly yours,

Artist:

_Martin L Dumas_
MARTIN LUTHER DUMAS, JR.

AGREED TO:

ATLANTIC RECORDING CORPORATION

By_ _Sheldon Vogel_

_Bruce C Butler_
BRUCE BUTLER

_Vincent J. Willis_
VINCE WILLIS

AGREED TO:

INTER-PAN INC.

By_ _P. J. Rossmon_
P. J. Rossmon, Pres.

_Paul Coleman_
PAUL NEAL COLEMAN

_Ernest Donaldson_
ERNEST FRANK DONALDSON

_Norval Taylor_
NORVAL TAYLOR

_Wardell Peel_
WARDELL PEEL

_James Whitfield_
JAMES WHITFIELD

3 of 3

9. Notwithstanding anything contained in the agreement to the contrary, all rules and regulations of the American Federation of Musicians shall be incorporated in the agreement.