UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| Rasputin Stash LLC, Paul N. Coleman, Estate of Martin Dumas, Ernest Frank Donaldson, and Bruce Butler,<br><br>　　　　Plaintiffs,<br><br>　　　　　　v.<br><br>Bek David Campbell, Mike Simpson, John King, Joseph Guillmeron Jones, Cory Woods, and Atlantic Recording Corporation,<br><br>　　　　Defendants. | Case No.: 1:25-cv-04896 |

## SECOND AMENDED COMPLAINT

Plaintiffs Rasputin Stash LLC, Paul N Coleman, Estate of Martin Dumas, Ernest Frank Donaldson, and Bruce Butler, pursuant to Rule 15 of the Federal Rules of Civil Procedure and by and through their undersigned attorneys, state as follows:

### Nature of This Action

1.　　Plaintiffs Rasputin Stash LLC, Paul N Coleman, Estate of Martin Dumas, Ernest Frank Donaldson, and Bruce Butler (each a "Plaintiff" and collectively "Plaintiffs") seek monetary from and injunctive relief against Defendants Bek David Campbell, Mike Simpson, John King, , Joseph Guillmeron Jones, Cory Woods and Atlantic Recording Corporation (each a "Defendant" and collectively "Defendants") for copyright infringement of two musical compositions pursuant to the Copyright Act (17 U.S.C. § 101 *et al.*) and two pre-1972 sound recordings pursuant to the common law of the State of New York.

### Parties

2.　　Plaintiff Rasputin Stash LLC ("Rasputin Stash") is a limited liability company organized under the laws of the State of Illinois, formed to administer the copyright rights for the

1

musical group Rasputin Stash. Rasputin Stash was an eight-member recording group active in the 1970s, founded by Martin Dumas, composed of: Paul N. Coleman, Ernest Frank Donaldson, Bruce Butler, Vince Willis, Martin Dumas (deceased), Wardell Peele (deceased), Norval Taylor (deceased), and James Whitfield (deceased).

3. Plaintiff Paul N. Coleman ("Coleman") is an individual residing in Illinois and was a member of the band Rasputin Stash.

4. Plaintiff Estate of Martin Dumas ("Dumas Estate") is the estate of Martin Dumas, the deceased founder of the band Rasputin Stash.

5. Plaintiff Ernest Frank Donaldson ("Donaldson") is an individual residing in Illinois and was a member of the band Rasputin Stash.

6. Plaintiff Bruce Butler ("Butler") is an individual residing in Illinois and was a member of the band Rasputin Stash.

7. Defendant Bek David Campbell ("Bek") is a singer, songwriter, record producer, and musician residing, upon information and belief, in Los Angeles, California. Bek is famous for his experimental lo-fi style and his ability to create musical collages that span many genres.

8. Defendant Atlantic Recording Corporation ("Atlantic") is a corporation organized under the laws of the State of Delaware with an address at 1633 Broadway, New York, New York 10019.

9. Defendant Michael Simpson p/k/a Z Mike ("Simpson") is a songwriter and producer residing, upon information and belief, in Los Angeles, California. Simpson is a member of The Dust Brothers duo, which is famous for its sample-based music.

10.     Defendant John King p/k/a King Gizmo ("King") is a songwriter and producer residing, upon information and belief, in Los Angeles, California. King is a member of The Dust Brothers duo, which is famous for its sample-based music.

11.     Defendant Joseph Guillermon Jones p/k/a Jim Jones ("Jones") is an individual residing in the State of New York. Jones is a rapper, producer, writer, and a founding member of the hip-hop collective The Diplomats.

12.     Defendant Cory Woods p/k/a Raekwon ("Woods") is an individual residing in the State of New York. Woods is a rapper, entertainer, and a founding member of Wu-Tang Clan.

### Jurisdiction and Venue

13.     This action arises, in part, under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act").

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

15.     This Court has supplemental jurisdiction to hear Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1400 in that a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this judicial district and all Plaintiffs are residents of Illinois.

17.     This Court has personal jurisdiction over each of the Defendants because, upon information and belief, each Defendant derives substantial revenue from activities directed at this judicial district, conducts systemic and continuous business within this judicial district, and has taken actions causing harm to Plaintiffs, residents of Illinois, including infringing upon

3

Plaintiffs' federal copyright rights and common law copyright rights, which are the basis of this action.

## Statement of Facts

18. On June 1, 1971, Plaintiff members of Rasputin Stash, ("Rasputin" herein) an eight-man group of musicians from Chicago, entered into a production agreement with Inter-Pan Inc. ("Inter-Pan") to record music (the "Inter-Pan Agreement"). *See* Exhibit 1. Under the Inter-Pan Agreement, Plaintiff members of Rasputin recorded exclusively with Inter-Pan in exchange for royalties earned from the sale of the resulting sound recordings.

19. In a related agreement made on June 1, 1971, Inter-Pan entered a production agreement with Atlantic to provide sound recordings created and produced by Rasputin under the Inter-Pan Agreement, for distribution (the "Atlantic Agreement"). Inter-Pan received an advance of $12,500, repayable from royalties earned by Rasputin. *See* Exhibit 2.

20. Under the Inter-Pan Agreement, Plaintiff members of Rasputin assigned their rights in the sound recordings produced as part of the Inter-Pan Agreement to Inter-Pan on the condition that Inter-Pan pay Plaintiff members of Rasputin a percentage of the profits generated by Inter-Pan's exploitation of the same.

21. The Atlantic Agreement expressly references and is dependent upon the Inter-Pan Agreement (together, the "Agreements").

22. In the Atlantic Agreement, Inter-Pan assigned its rights in the sound recordings produced as part of the Inter-Pan Agreement to Atlantic on the condition that Atlantic pay certain percentages of the profit Atlantic earned by exploiting the sound recordings in different ways.

23. Paragraph 3(d) of the Atlantic Agreement states that Atlantic "agrees to pay to [Inter-Pan] the following royalties: . . . (d) A sum equal to one-half (1/2) of the net profits

4

actually received by [Atlantic] for any other uses of said Masters not specifically provided for herein."

24.  Paragraph 14 of the Atlantic Agreement states that "[t]his agreement shall be construed pursuant to and governed by the laws of the State of New York applicable to agreements to be wholly performed therein . . . ."

25.  The sound recordings produced pursuant to the Agreements were protected by common law copyright under the laws of the State of New York.

26.  The musical compositions produced pursuant to the Agreements were protected by the Copyright Act and all such copyright rights were retained by Plaintiffs.

27.  On September 1, 1971, Atlantic released the "Rasputin Stash" album featuring recordings of songs written and recorded by Plaintiffs pursuant to the Agreements. ("Album" herein). The Album was not promoted and was not a commercial success, at that time.

28.  Two original songs, Dookey Shoe and Mr. Cool, were written and recorded pursuant to the Agreements and appeared on the Album.

29.  Plaintiff Coleman wrote the musical composition for Dookey Shoe, which is protected by federal Copyright Registration No. EU269,208. *See* Exhibit 3.

30.  Plaintiff Dumas wrote the musical composition for Mr. Cool, which is protected by federal Copyright Registration No. EU269,206. Dookey Shoe and Mr. Cool are referred to together herein as the "Works." *See* Exhibit 4.

31.  Years later, Rasputin disbanded and Inter-Pan dissolved.

32.  In 2023, Plaintiff members of Rasputin discovered that the Album was being offered for sale on the Internet and that the Works had been sampled by several hip hop artists.

33.     Upon information and belief, Atlantic licensed samples of the Works to various recording artists, including Defendants Bek, Simpson, King, Jones, and Woods ("Artist Defendants").

34.     Pursuant to the Atlantic Agreement, one half of any net profits generated by Atlantic through licensing samples of the Works should have been paid to Inter-Pan, which would have paid Plaintiffs.

35.     Upon information and belief, Atlantic generated profit by licensing samples of the Works.

36.     Atlantic did not pay any of the profits generated by licensing samples of the Works to Inter-Pan or any Plaintiff.

37.     Any Artist Defendant that incorporated a sample from the Works in a new sound recording would, in addition to a license from the owner of the sound recording, require a license from the owner of the relevant musical composition.

38.     No Artist Defendant obtained a license from Plaintiffs, which own the copyright rights for the relevant musical compositions.

39.     Upon information and belief, Artist Defendants generated profit by sampling the Works.

<u>**Claims for Relief**</u>

**COUNT I – COPYRIGHT INFRINGEMENT**
*As to Artist Defendants*

40.     Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 39.

41.     Plaintiff Coleman is the owner of Copyright Registration No. EU269,208 for the musical composition for the song Dookey Shoe.

6

42. Plaintiff Dumas is the owner of Copyright Registration No. EU269,206 for the musical composition for the song Mr. Cool.

43. Defendant Campbell released his album Odelay in 1996, containing the songs High 5 (Rock the Catskills) and Hotwax.

44. High 5 (Rock the Catskills) incorporates a sample of the sound recording of Mr. Cool.

45. Hotwax incorporates a sample of the sound recording of Dookey Shoe.

46. Defendant Campbell used Mr. Cool and Dookey Shoe as samples without authorization from Plaintiffs Dumas and/or /Coleman.

47. Defendant Campbell's use of Mr. Cool and Dookey Shoe as samples without authorization constitutes copyright infringement.

48. Defendants Simpson and King collaborated on the release of the album Odelay in 1996, containing the songs High 5 (Rock the Catskills) and Hotwax.

49. High 5 (Rock the Catskills) incorporates a sample of the sound recording of Mr. Cool.

50. Hotwax incorporates a sample of the sound recording of Dookey Shoe.

51. Defendants Simpson's and King's used Mr. Cool and Dookey Shoe as samples without authorization from Plaintiffs Dumas and/or /Coleman.

52. Defendants Simpson's and King's use of Mr. Cool and Dookey Shoe as samples without authorization constitutes copyright infringement.

53. Defendant Jones released his song We Fly High, in 2006.

54. We Fly High incorporates a sample of the sound recording of Mr. Cool.

7

55.     Defendant Jones used Mr. Cool as a sample without authorization from Plaintiff Dumas.

56.     Defendant Jones's use of Mr. Cool as a samples without authorization constitutes copyright infringement.

57.     Defendant Woods released We Fly High, in 2006.

58.     We Fly High incorporates a sample of the sound recording of Mr. Cool.

59.     Defendant Woods used Mr. Cool as a sample without authorization from Plaintiff Dumas.

60.     Defendant Woods' use of Mr. Cool as a sample without authorization constitutes copyright infringement

61.     Defendant Woods released Stick Up Music in 2009.

62.     Stick up Music incorporates a sample of the sound recording of Mr. Cool.

63.     Defendant Woods used Mr. Cool as a sample without authorization from Plaintiff Dumas.

64.     Defendant Woods' use of Mr. Cool as a sample without authorization constitutes copyright infringement

65.     As a direct result of Artist Defendants' acts of infringement, Plaintiffs Dumas and Coleman are entitled to injunctive relief, damages, and disgorgement of profits.

66.     The Artist Defendants' infringing acts described herein were committed willfully and continue to be committed willfully as they are still being distributed.

## COUNT II – BREACH OF CONTRACT/ACCOUNTING/RESCISSION
### As to Atlantic Recording Corporation

67.     Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 66.

8

77. The relevant sound recordings were created by Plaintiffs under the Agreements between Plaintiffs, Inter-Pan, and Atlantic.

78. Such sound recordings were created pursuant to the Agreements and under the laws of the State of New York.

79. Pursuant to the Agreements, sound recordings were assigned to Atlantic on the condition that Atlantic pay royalties at rates set for different revenue streams related to the exploitation of the sound recordings.

80. Pursuant to the Agreements, Atlantic must pay Inter-Pan one half of the net profits derived from any use of those sound recordings not expressly contemplated by the Agreements so that Inter-Pan could pay royalties to Plaintiffs.

81. Inter-Pan's dissolution does not absolve Atlantic of its obligation to pay out one half of the net profits derived from any use of the sound recordings as described above.

82. Atlantic has, upon information and belief, generated significant profits licensing the sound recordings at issue to various recording artists for use as samples but has not made any payments to Plaintiffs.

83. Plaintiffs are entitled to an accounting of all profits generated by Atlantic through its exploitation of the sound recordings created under the Agreements.

84. Atlantic's failure to make any of the required payments described above is cause for rescission of the Agreements.

85. The dissolution of Inter-Pan is cause for rescission of the Agreements.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask that the Court enter the following judgment against Defendants:

9

1. That Defendants, their officers, agents, servants, employees, and any persons in active concert or participation with them be permanently enjoined and restrained from infringing upon Plaintiffs' copyrighted Works in any manner whatsoever, and specifically distributing copies of sound recordings embodying Plaintiffs' federally registered musical compositions;

2. Order the impounding of all sound recordings embodying Plaintiffs' federally registered musical compositions that are within Defendants' possession, custody, or control;

3. Award Plaintiffs their actual damages as well as Defendants' profits attributed to Defendants' infringing acts;

4. Award Plaintiffs their costs and attorneys' fees incurred in this action;

5. Award Plaintiffs pre-judgment interest on their judgment;

6. Order a full accounting from Atlantic of all profits generated by their exploitation of the relevant sound recordings; and

7. Such other and further relief as the Court may deem equitable, proper and just.

Dated:     April 13, 2026                  Respectfully submitted,
          Chicago, Illinois                 SEAN M. MULRONEY & ASSOCIATES

By:     /s/: Sean Mulroney
        Sean M. Mulroney
        516 N. Ogden Avenue
        Suite 191
        Chicago, Illinois 60607
        (t) 312.756.0011
        (e) sean@seanmulroney.com

        Anderson J. Duff
        DUFF LAW PLLC
        353 Ocean Avenue 4E
        Brooklyn, New York 11226
        (t) 646.450.3607
        (e) ajd@hoganduff.com

EXHIBIT 1

June 1, 1971

Atlantic Recording Corporation
1841 Broadway
New York, New York    10023

Gentlemen:

Reference is made to a certain agreement dated June 1, 1971 between you and INTER-PAN INC. (hereinafter called "PRODUCTIONS") relating to my exclusive services as a recording artist ("said agreement").

In order to induce you to enter into said agreement and to pay a good valuable consideration therefor, I hereby agree as follows:

1.  I hereby specifically guarantee the performance by PRODUCTIONS of all of the warranties and representations and covenants made in said agreement. I hereby make all of the warranties and representations made to you in said agreement, grant you all of the rights and remedies therein granted to you and agree to perform all of the obligations therein undertaken to be performed for you and undertake to be bound thereby as though I was a party to said agreement. I agree that you shall have the right in addition to any other remedies available to you at law or in equity or by reason of this agreement or said agreement to specifically enforce said agreement against me. No notice need be given to me of any modification or waiver of the provisions of said agreement for the purposes of your enforcing said agreement or this agreement against me.

2.  Without limiting any of the rights granted to you in the said agreement, I hereby grant you the right to use and publish and to permit others to use and publish my name, *likeness and all biographical material concerning me and to permit others to write and publish articles concerning me for advertising or trade purposes in connection with the sale and exploitation of my records.

3.  I agree that I will look solely to PRODUCTIONS for the payment of all monies payable to me by reason of my rendering my services in accordance with said agreement, and I agree that you shall have no responsibility to me therefor whatsoever. No breach by PRODUCTIONS of any agreement or agreements which I may now or from time to time have with PRODUCTIONS shall be sufficient cause

*  (and the name "RASPUTIN'S STASH")



-2-

for my failure or refusal to fully perform for you in accordance with the said agreement and this agreement. Should any dispute arise between me and PRODUCTIONS, you shall, upon notice by me, sent to you by registered mail, withhold the payment of all sums due and becoming due to PRODUCTIONS pursuant to said agreement pending a determination of such dispute. No failure on your part to make any payment to PRODUCTIONS by reason of such withholding shall be deemed to be a breach of said agreement. Should PRODUCTIONS fail or refuse to produce recordings by me for you pursuant to said agreement, you shall have the right to designate the producers of such recording who shall render their services at the expense of PRODUCTIONS, and I shall render my services with such producers directly for you.

4. I agree to fully render any performances for you and PRODUCTIONS in accordance with said agreement for so long as said agreement shall be in effect. I further agree that for so long as said agreement shall be in effect I will exclusively render my performances for you in connection with the production of phonograph records and I will not perform in any capacity whatsoever (individually or as part of a group or otherwise) for any other person, firm or corporation for the purpose of making phonograph records.

5. In the event of the breach of any term hereof or of said agreement by me, I agree that you shall be entitled to injunctive relief in addition to any other rights or remedies available to you. It is agreed that my services for the purpose of recording phonograph records pursuant to said agreement and this agreement are of a special, unique and extraordinary character.

6. I warrant and represent that I have the right to enter into this agreement, and that I and PRODUCTIONS have the right to grant you all of the rights granted in said agreement and in this agreement, and that neither this agreement nor said agreement nor any performance of ours thereunder shall be in violation of the rights of any third party.

7. I agree to indemnify you and hold you harmless from and against any liability, loss, damage, cost or expense including reasonable legal fees paid or incurred by you by reason of any breach by me or PRODUCTIONS or failure of the covenants, representations or warranties contained herein or in said agreement.



-3-

8. You shall have the right to secure insurance with respect to me for your own benefit. In this connection, I agree to make myself available for physical examinations by a physician as and when reasonable requested to do so and to complete such question-naires and other documents which you or any insurance carrier may from time to time require in connection with securing and main-taining such insurance.

If the foregoing is in accordance with your understanding, please sign below.

Very truly yours,

Artist:

*Martin L Dumas*

MARTIN LUTHER DUMAS, JR.

AGREED TO:

ATLANTIC RECORDING CORPORATION

By *Sheldon Vogel*

*Bruce C Butler*

BRUCE BUTLER

*Vincent J. Willis*

VINCE WILLIS

AGREED TO:

INTER PAN INC.

By *[signature]*

P. J. Rossmon, Pres.

*Paul Coleman*

PAUL NEAL COLEMAN

*Ernest [signature]*

ERNEST FRANK DONALDSON

*Norval Taylor*

NORVAL TAYLOR

*Wardell Peel*

WARDELL PEEL

*James Whitfield*

JAMES WHITFIELD

9. Notwithstanding anything contained in the agreement to the contrary, all rules and regulations of the American Federation of Musicians shall be incorporated in the agreement.

EXHIBIT 2

Dated: June 1, 1971

Inter-Pan Inc.
John Hancock Center (Suite 5125)
Chicago, Illinois 60611

Dear Sir:

This letter will set forth and constitute a binding agreement between you (hereinafter referred to as "Seller") and ourselves (hereinafter referred to as "Purchaser").

1.  (a)  Seller represents and warrants that it is the sole and exclusive owner of the entire right, title and interest including all copyrights and all property rights in and to the master recordings subject and becoming subject to this agreement and in and to the performances embodied thereon for the entire world (hereinafter referred to as the "Masters").

(b)  Seller further represents and warrants that the Masters and the performances embodied thereon were produced in all respects in accordance with the rules and regulations of the American Federation of Musicians and all other Unions having jurisdiction; that the Masters and the performances embodied thereon do not come within the terms of paragraph 17 of the American Federation of Musicians Phonograph Record Labor Agreement (April, 1969)* or that the requirements of said paragraph have been satisfied; that such representation and warranty is included for the benefit of the American Federation of Musicians (among others) and may be enforced by it or by such person or persons as it may designate; that it has the entire right and authority to enter into and to perform this agreement and all parts thereof; that is has not granted, nor has it done or permitted others to do, nor will it do or permit others to do any acts or things which would be in derogation of the absolute title of any of the rights herein granted to Purchaser, nor has it made nor will it make any grant of rights or permit the making of any grant of rights incorporated with the title and rights herein granted to any one other than Purchaser; that there are no claims or threats of claims or litigations involving the Masters or said performances; that all costs incurred in the creation and production of such Master have been paid and that neither the Master nor the performances embodied thereon nor any use thereof by Purchaser or its grantees will violate or infringe upon the rights of any third parties. Seller agrees to and hereby does hold Purchaser harmless against any and all liability, loss, damage, cost or expense, including

* or the equivalent provisions of any successor agreement

- 2 -

legal fees, paid by or incurred by reason of any breach or
failure or claim of breach or failure of any of Seller's
covenants, warranties or representations hereunder. Pending
the determination of any such claim, failure or breach,
Purchaser is granted the right to withhold payment of royalties
hereunder.

2.  Seller hereby sells, assigns and tranfers to
Purchaser, its successors or assigns, absolutely and forever
and without any limitations or restrictions whatever, not
specifically set forth herein, the entire right, title and
interest in and to each of the Masters and in and to each of
the performances embodied thereon. Promptly following the
execution of this agreement Seller shall deliver to Purchaser
all tape recordings, acetates and metal or other parts or re-
productions of said Masters presently in existence and shall
immediately cease and discontinue the manufacture, distribution
and sale of all reproductions of said Masters. Seller further
assigns to Purchaser absolutely and forever all rights and
privileges of Seller to use the names, biographies and like-
nesses of all artists whose performances are embodied on said
Masters,* and all other rights, privileges and interests now
known or herafter to come into existence, now or hereafter
owned or controlled by Seller, which pertain to, have any
commercial effect upon or are derived from said Masters and
the performances embodied thereon.

3.  In full consideration for the sale to it of said
Masters and of the performances embodied thereon, Purchaser
agrees to pay to Seller the following royalties:

(a)  A sum equal to eight and one-half (8½) percent of the
retail list price for ninety (90%) percent of all records
manufactured from said Masters and sold and paid for within
the Continental United States and not subject to return;

(b)  A sum equal to one-half (½) of the above
sum for ninety (90%) percent of all records manufactured from
said Masters and sold outside of the Continental United States.
Said sum shall be payable only thirty (30) days after Purchaser
has received such sums in the United States in United States
currency;

(c)  A sum equal to one-half (½) the applicable
sum set forth in subparagraph (a) or (b) above for records
sold in the form of pre-recorded tape or sold by way of mail
order or "club" plans as distinguished from regular retail
store sales. No monies shall be payable on "bonus" or "free"
records distributed by "clubs";

*as well as their professional name "RASPUTIN'S STASH"



- 3 -

(d)  A sum equal to one-half (½) of the net profits actually received by Purchaser for any other uses of said Masters not specifically provided for herein.

(e)  In the event Masters hereunder are coupled or released together with masters not subject to the terms hereof on one recording, Seller will receive that proportion of the sums payable to it hereinabove as the number of Masters hereunder embodied on such recording bears to the total number of masters embodied thereon;

(f)  Retail list price is hereby defined as being the suggested retail selling price in the country of manufacture or sale, at Purchaser's option, less taxes, duties and Purchaser's standard deductions in respect of packaging. Monies shall not be payable to Seller for any records given away or sold at less than Purchaser's actual costs therefor, for "cutouts", or for records sold or distributed at less than Purchaser's normal wholesale list price in order to effectuate a discount from such wholesale list price;

(g)  The sums above payable include all monies payable to recording artists whose performances are embodied on said master and the producers thereof; and Seller agrees to pay and to be solely liable for payment of all monies payable or becoming payable to said recording artists and producers.

4.  Payments of all sums to Seller, except those set forth in Paragraph 3 (b) hereof, shall be made quarterly within sixty (60) days following the calendar quarters ending March 31, June 30, September 30 and December 31 and shall be accompanied by a statement setting forth the computation of such sums. Unless Seller objects, in writing, to any such statement or payment within ninety (90) dyas after receipt thereof, said statement or payment shall be deemed finally binding upon and accepted by Seller.



- 4 -

5. Seller agrees that for a period of five (5) years from the date of Purchaser's purchase of each master recording subject and becoming subject to this agreement, Seller will not record or produce nor will Seller permit others to record or produce phonograph records embodying the performance by any artisit whose performance is embodied in any master recording subject and becoming subject to this agreement, of the composition embodied in such master recording, for anyone other than Purchaser.

6. For the purposes hereof, "phonograph record", "record" and "master" are defined as meaning any device of any kind of nature whether now or hereafter known, for the reproduction of sound, whether or not the sound is synchronized with visual images including, but not limited to, all types of electronic video recordings.

7. Seller warrants and represent that Martin Luther Dumas, Jr., Bruce Butler, Vince Willis, Paul Neal Coleman, Ernest Frank Donaldson, Norval Taylor, Wardell Peel and James Whitfield, (hereinafter jointly and severally called "Artist") is under exclusive contract to Seller as a recording artist for a period no less extensive that the term of this agreement set forth in Paragraph 10 hereof in such manner that Purchaser shall have the right to acquire all recordings made during the term of this agreement by any one or more of the aforesaid individuals, whether as an individual or as a member of the group known as "RASPUTIN'S STASH" or any other group, regardless of the name or names under which they may identify themselves. Seller agrees to cause Artist to execute the guaranty annexed hereto as Exhibit "1" by which Artist shall agree to fully render their services so that Purchaser shall have all of the benefits provided for in this agreement. For so long as Purchaser shall have any rights pursuant to this agreement, Seller shall not waive or forfeit its exclusive rights to the services of said Artist.

8. Upon the execution and delivery to purchase of this agreement and the Exhibit annexed hereto, Purchaser shall pay to Seller the sum of $12,500., which payment shall constitute an advance against and shall be recouped from all royalties becoming payable to Seller by reason of this agreement.

9. Seller hereby grants to Purchaser the exclusive right and option during the term of this agreement to purchase upon the terms and conditions hereof each and every master recording now or hereafter owned or controlled by Seller directly or indirectly, or produced with Seller's authority, which embodies the performances of Artist but in no event less than two (2) 33 1/3 rpm long-playing phonograph record albums per year or the equivalent number of single master recordings. In this connection, Seller agrees that, upon



Purchaser's request, Seller shall propose in writing to Purchaser a specific recording project, including the musicians and producer (s) whose services will be used, the musical compositions to be recorded and the estimated costs with respect to the recording session or sessions. Each project shall be subject to written approval by Purchaser in advance. Upon receipt of approval, Seller shall produce such recording sessions as have been approved, and Purchaser's representatives may attend such sessions. Purchaser agrees to pay the actual invoices for such sessions up to the amount of the approved budget, which payments shall constitute advances against and shall be recouped from all royalties becoming payable to Seller by reason of this agreement. Seller agrees to make the finished tape or tapes available to Purchaser immediately upon completion, subject to this agreement.

10. The term of this agreement shall be for a period of one (1) year from the date hereof. Purchaser shall have the irrevocable right and option to extend the term of this agreement for four (4) additional consecutive separate and severable periods of one (1) year each. Purchaser shall exercise its options by giving Seller written notice of such exercise, at least twenty (20) days prior to the date on which this agreement would otherwise expire.

11. Subject to the availability of sufficient number of completed masters sufficiently in advance of the first contract year hereunder, Purchaser agrees to release at least two (2) 33 1/3 rpm long-playing albums or the equivalent number of 45 rpm "singles" during such year.

12. Seller agrees to indemnify Purchaser and hold Purchaser harmless from and against all liability, loss, damage, cost or expense, including reasonable legal fees, paid or incurred by Purchaser by reason of any breach or failure of Seller's or Artist's representations or warranties hereunder. Pending the determination of any claim involving such breach or failure, Purchaser may withhold payment of royalties hereunder in an amount reasonably related to the value of the claim. Seller shall have the right to participate in the defense of any such claims at its own expense.

13. In the event that Artist shall write or compose any musical composition which is recorded by Artist hereunder, or in the event that Seller shall own or control directly or indirectly, any such musical composition, Seller agrees to assign or cause to be assigned to Purchaser or its designee an undivided fifty (50%) percent interest in and to each such composition and all copyrights therein, together with the exclusive right to administer each such composition throughout the entire world. In this connection, the



parties agree to execute or cause to be executed all documents necessary to effectuate the interest hereof.

14.    This agreement shall be binding upon both Seller and Purchaser and their respective successors and assigns, and shall be deemed effective upon the date of this letter.   This agreement shall be construed pursuant to and governed by the laws of the State of New York applicable to agreements to be wholly performed therein, and is the entire agreement between parties and cannot be modified except in a writing signed by both parties hereto.   Invalidity or unenforceability of any part of this agreement shall not affect the validity and enforceability of the balance thereof.

15. See Rider attached and made a part hereof.

Very truly yours,

ATLANTIC RECORDING CORPORATION

BY _____

AGREED TO:

INTER-PAN INC.

BY _____

Employer Identification No.

applied for

## R I D E R

Notwithstanding anything contained in the agreement to the contrary, the following provisions shall apply:

1. Upon reasonable notice Seller shall have the right to audit the books and records of Purchaser not more than once each year as such records pertain to the subject matter of this agreement.

2. All rules and regulations of the American Federation of Musicians are incorporated in this agreement.

3. With respect to paragraphs 3 and 10, each option year the royalty rate 3(a) shall be increased 1/2% up to a ceiling of ten per cent (10%).

4. With respect to paragraph 13, all compositions under the control of Seller and assigned to designee of Purchaser and recorded by Artist shall be licensed at no less than the statutory rate if such compositions are released by Purchaser or one of its controlled companies.

5. Purchaser may elect at any time hereunder to provide its own producer for Artist sessions upon reasonable notice to Seller. Costs for same shall be paid exclusively by Purchaser.

ATLANTIC RECORDING CORPORATION

By _____

INTER-PAN INC.

By _____

# EXHIBIT 3

Page 3

# Certificate
## Registration of a Claim to Copyright

In a musical composition the author of which is a citizen or domiciliary of the United States of America or which was first published in the United States of America



| CLASS | REGISTRATION NO. |
| --- | --- |
| E | E u 269208 |
| | DO NOT WRITE HERE |

**This Is To Certify** that the statements set forth in this certificate have been made a part of the records of the Copyright Office. In witness whereof the seal of the Copyright Office is hereto affixed.



*Register of Copyrights*
*United States of America*

**1. Copyright Claimant(s) and Address(es):**

Name _____ Paul Neal Coleman _____

Address ____ 7901 S. Paxton St., Chicago, Ill. ____

Name _____

Address _____

**2. Title:** ____ "DOOKEY SHOE" ____

(Title of the musical composition)

**3. Authors:**

Name _____ Paul Neal Coleman _____ Citizenship: U.S.A. __X__ Other _____
(Legal name followed by pseudonym if latter appears on the copies) (Check if U.S. citizen) (Name of country)

Domiciled in U.S.A. Yes _X_ No ____ Address 7901 S. Paxton St., Chicago Author of Words & Music
(State which: words, music, arrangement, etc.)

Name _____ Citizenship: U.S.A. _____ Other _____
(Legal name followed by pseudonym if latter appears on the copies) (Check if U.S. citizen) (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address _____ Author of _____
(State which: words, music, arrangement, etc.)

Name _____ Citizenship: U.S.A. _____ Other _____
(Legal name followed by pseudonym if latter appears on the copies) (Check if U.S. citizen) (Name of country)

Domiciled in U.S.A. Yes ____ No ____ Address _____ Author of _____
(State which: words, music, arrangement, etc.)

**4. (a) Date of Publication:**

_____
(Month) (Day) (Year)

**(b) Place of Publication:**

_____
(Name of country)

**5. Previous Registration or Publication:**

Was work previously registered? Yes _____ No _____ Date of registration _____ Registration number _____

Was work previously published? Yes _____ No _____ Date of publication _____ Registration number _____

Is there any substantial **NEW MATTER** in this version? Yes _____ No _____ If your answer is "Yes," give a brief general statement of the nature of the **NEW MATTER** in this version.

EXAMINER

*Complete all applicable spaces on next page*

6. Deposit account:

7. Send correspondence to:

Name ............ Inter-Pan, Inc. ............ Address .. John Hancock Center - Suite 5125.
Chicago, Ill.   60611

8. Send certificate to:

(Type or print name and address)

Name ............ Inter-Pan, Inc. ............

Address ............ John Hancock Center - Suite 5125 ............
(Number and street)

............ Chicago, Illinois  60611 ............
(City)               (State)               (ZIP code)

## Information concerning copyright in musical compositions

*When To Use Form E.* Form E is appropriate for unpublished and published musical compositions by authors who are U.S. citizens or domiciliaries, and for musical compositions first published in the United States.

*What Is a "Musical Composition"?* The term "musical composition" includes compositions consisting of music alone, or of words and music combined. It also includes arrangements and other versions of earlier compositions, if new copyrightable work of authorship has been added.

—*Song Lyrics Alone.* The term "musical composition" does not include song poems and other works consisting of words without music. Works of that type are not registrable for copyright in unpublished form.

—*Sound Recordings.* Phonograph records, tape recordings, and other sound recordings are not regarded as "copies" of the musical compositions recorded on them, and are not acceptable for copyright registration. For purposes of deposit, the musical compositions should be written in some form of legible notation. If the composition contains words, they should be written above or beneath the notes to which they are sung.

*Duration of Copyright.* Statutory copyright begins on the date the work was first published, or, if the work was registered for copyright in unpublished form, copyright begins on the date of registration. In either case, copyright lasts for 28 years, and may be renewed for a second 28-year term.

### Unpublished musical compositions

*How To Register a Claim.* To obtain copyright registration, mail to the Register of Copyrights, Library of Congress, Washington, D.C., 20540, one complete copy of the musical composition, an application Form E, properly completed and signed, and a fee of $6. Manuscripts are not returned, so do not send your only copy.

*Procedure To Follow if Work Is Later Published.* If the work is later reproduced in copies and published, it is necessary to make a second registration, following the procedure outlined below. To maintain copyright protection, all copies of the published edition must contain a copyright notice in the required form and position.

### Published musical compositions

*What Is "Publication"?* Publication, generally, means the sale, placing on sale, or public distribution of copies. Limited distribution of so-called "professional" copies ordinarily would not constitute publication. However, since the dividing line between a preliminary distribution and actual publication may be difficult to determine, it is wise for the author to affix notice of copyright to copies that are to be circulated beyond his control.

*How To Secure Copyright in a Published Musical Composition:*
1. *Produce copies with copyright notice,* by printing or other means of reproduction.
2. *Publish the work.*
3. *Register the copyright claim,* following the instructions on page 1 of this form.

*The Copyright Notice.* In order to secure and maintain copyright protection for a published work, it is essential that all copies published in the United States contain the statutory copyright notice. This notice shall appear on the title page or first page of music and must consist of three elements:

1. *The word "Copyright," the abbreviation "Copr.," or the symbol* ©. Use of the symbol © may result in securing copyright in countries which are parties to the Universal Copyright Convention.

2. *The year date of publication.* This is ordinarily the date when copies were first placed on sale, sold, or publicly distributed. However, if the work has been registered for copyright in unpublished form, the notice should contain the year of registration; or, if there is new copyrightable matter in the published version, it should include both dates.

3. *The name of the copyright owner (or owners).* Example: © John Doe 1966.

NOTE: If copies are published without the required notice the right to secure copyright is lost and cannot be restored.

| FOR COPYRIGHT OFFICE USE ONLY | |
|---|---|
| Application received | |
| One copy received | |
| Two copies received | |
| Fee received   7543 JUL 23 71 | |

EXHIBIT 4

# Detailed Record View

## Registration record RE0000803820

Copyright Catalog

Displaying 16 of 137 entries

◀ Previous    Next ▶

## Mr. Cool. w Martin Dumas, Jr., m Vincent Willis.

Share ➔    Actions ⌄

| | |
|---|---|
| **Registration Number / Date** | RE0000803820 / 1999-01-21 |
| **Renewal Registration for** | EU0000269206 / 1971-07-23 |
| **Type of Work** | Music |
| **Title** | Mr. Cool. w Martin Dumas, Jr., m Vincent Willis. |
| **Variant Title** | Mr. Cool |
| **Copyright Claimant** | Martin Dumas, Jr. & Vincent Willis (A) |
| **Names** | Dumas, Martin, Jr. |
| | Willis, Vincent |

Case: 1:25-cv-04896 Document #: 52 Filed: 04/27/26 Page 27 of 27 PageID #:308